UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                Case No. 8:21-cv-

ASSETS IDENTIFIED IN
PARAGRAPH 1 OF
VERIFIED COMPLAINT,

    Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1956(c)(7)(F), as well as 18 U.S.C. §§ 981(a)(1)(A) and 1956(a)(1)(A)(i) and (B)(i), the following assets ("Defendant Assets"):

    a.    Approximately $869,859.98 seized from Wells Fargo Bank account number 2813610439, held in the name of Absolute Comfort Medical;

    b.    Approximately $1,025,453.76 seized from JPMorgan Chase Bank account number 288108076, held in the name of Advanced Medical Supply, LLC;

c.  Approximately $22,159.91 seized from JPMorgan Chase Bank account number 227791859, held in the name of American Bracing Solutions;

d.  Approximately $830,447.58 seized from JPMorgan Chase Bank account number 227791859, held in the name of American Bracing Solutions;

e.  Approximately $817,788.98 seized from JPMorgan Chase Bank account number 227185912, held in the name of Back Braces Plus;

f.  Approximately $32,291.64 seized from JPMorgan Chase Bank account number 227185912, held in the name of Back Braces Plus;

g.  Approximately $3,613.64 seized from JPMorgan Chase Bank account number 285851157, held in the name of Belle Oak Bracing;

h.  Approximately $1,037,986.71 seized from JPMorgan Chase Bank account number 285851157, held in the name of Belle Oak Bracing;

i.  Approximately $7,692.80 seized from JPMorgan Bank account number 229897209, held in the name of Bracing Partners, Inc.;

j.  Approximately $262,100.99 seized from JPMorgan Chase Bank account number 229897209, held in the name of Bracing Partners, Inc.;

k.  Approximately $508,806.42 seized from JPMorgan Chase Bank account number 228352131, held in the name of Caring for Your Pain Bracing;

l.  Approximately $1,491,690.90 seized from JPMorgan Chase Bank account number 252611873, held in the name of CP Bracing Supply, Inc.;

m. Approximately $20,502.20 seized from JPMorgan Chase Bank account number 228526270, held in the name of Discovery Medical Supply;

n.  Approximately $870,385.03 seized from JPMorgan Chase Bank account number 228526270, held in the name of Discovery Medical Supply;

2

o.  Approximately $939,125.08 seized from JPMorgan Chase Bank account number 233569596, held in the name of First Stop Medical Supply Inc.;

p.  Approximately $867,468.57 seized from JPMorgan Chase Bank account number 935025291, held in the name of Jackson Medical Supply, Inc.;

q.  Approximately $54,340.15 seized from JPMorgan Chase Bank account number 935025291, held in the name of Jackson Medical Supply, Inc.;

r.  Approximately $656.92 seized from JPMorgan Bank account number 935260518, held in the name of LJH Medical Solutions;

s.  Approximately $1,479,027.06 seized from JPMorgan Chase Bank account number 935260518, held in the name of LJH Medical Solutions;

t.  Approximately $268,045.76 seized from JPMorgan Chase Bank account number 935179502, held in the name of Lucky Medical Supply, Inc.;

u.  Approximately $292.26 seized from JPMorgan Chase Bank account number 935179502, held in the name of Lucky Medical Supply, Inc.;

v.  Approximately $828,765.87 seized from JPMorgan Chase Bank account number 285871825, held in the name of Mainlands Medical;

w.  Approximately $799,226.38 seized from JP Morgan Chase bank account 357297669, held in the name of SST Medical Solutions Inc.;

x.  Approximately $1,022,695.79 seized from Wells Fargo Bank account number 2617109521, held in the name of Tree Top Medical Inc.;

y.  Approximately $487,409.64 seized from JPMorgan Chase Bank account number 276115919, held in the name of Wellness Medical Solutions, Inc.;

z.  Approximately $616,559.40 seized from Wells Fargo Bank account number 5130704850, held in the name of Westside Medical Bracing, Inc.;

aa. Approximately $6,453.41 seized from Wells Fargo Bank account number 6326633200, held by Unique Media Connections; and

bb. Approximately $57,813.91 seized from Wells Fargo Bank account number 3063336337, held by Media Lead Kings.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.  This Court has *in rem* jurisdiction over the Defendant Assets pursuant to:

a.  28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred within the Middle District of Florida; and

b.  28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.  Venue is proper in the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district.

## SEIZURE OF THE DEFENDANT ASSETS

5.  The Defendant Assets identified in paragraphs 1(a), 1(b), 1(d), 1(e),

1(h), 1(l), 1(o), 1(p), 1(s), 1(t), 1(v), 1(x), 1(y), 1(z), and 1(aa) were seized pursuant to seizure warrants issued by this Court on April 9, 2019.

6.      The Defendant Assets identified in paragraph 1(j) and 1(k) were seized pursuant to seizure warrants issued by this Court on April 11, 2019.

7.      The Defendant Assets identified in paragraph 1(n) were seized pursuant to a seizure warrant issued by this Court on April 12, 2019.

8.      The Defendant Assets identified in paragraph 1(c), 1(f), 1(q), 1(w), and 1(bb) were seized pursuant to seizure warrants issued by this Court on May 2, 2019.

9.      The Defendant Assets identified in paragraph 1(g), 1(i), 1(m), 1(r), and 1(u) were seized pursuant to seizure warrants issued by this Court on May 9, 2019.

10.      Pursuant to Supplemental Rule G(3)(b)(i), the Clerk of Court must issue a warrant to arrest the Defendant Assets because they are in the Government's possession, custody, or control.

## STATUTORY BASIS FOR FORFEITURE

11.      The Defendant Assets represent proceeds of a criminal conspiracy to commit the health care fraud offenses set forth in 18 U.S.C. §§ 1035 (making false statements relating to health care matters) and 1347 (health care fraud), as well as 42 U.S.C. § 1320a-7b(b)(2)(illegally offering and paying remuneration), in violation of 18 U.S.C. §§ 371 and 1349.

12.      The Defendant Assets are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for

the civil forfeiture of any property which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. 18 U.S.C. § 981(a)(1)(C). A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(F), includes any act or activity constituting an offense involving a "Federal health care offense." Pursuant to 18 U.S.C. § 24(a), the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate, 18 U.S.C. §§ 371, 1035, 1347, 1349, and/or 42 U.S.C. § 1320a-7b (as well as a number of other offenses), if the violation or conspiracy relates to a health care benefit program.[1]

13.     The Defendant Assets identified in paragraphs 1(aa) and 1(bb) are also subject to civil forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the civil forfeiture of any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property. Section 1956 (a)(1)(A)(i) and (B)(i) makes it a crime to knowingly conduct, or attempt to conduct, a financial transaction with proceeds from "specified unlawful activity" with the intent to promote the specified unlawful activity and to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

---

[1] The term "health care benefit program" is defined at 18 U.S.C. § 24(b) to mean any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, including any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

# FACTS

14.     Specific details of the facts and circumstances supporting the forfeiture of the Defendant Assets have been provided by Federal Bureau of Investigation (FBI) Special Agent Tina L. Repp, who has been a Special Agent with the FBI for the past twenty years. Since 2014, Agent Repp has been assigned to the Tampa Field Office, Pinellas Resident Agency, where she has conducted white collar crime investigations. Agent Repp has personally participated in this investigation since late 2018. The following facts are based on Agent Repp's personal knowledge of this investigation, including a review of documents and computer records related to this investigation, witness interviews, and communications with others who have personal knowledge of the events and circumstances described below.

## I.     THE CRIMINAL CONSPIRACY

15.     As detailed below, the conspirators established, through fraud, numerous companies that supplied durable medical equipment ("DME"), including, pertinently, braces (e.g., knee braces, back braces, shoulder braces, wrist braces, and other "off-the-shelf" braces). The conspirators then used these DME supply companies to submit over approximately $308 million in illegal claims to the Medicare Program ("Medicare"), resulting in payments of over approximately $165 million for fraudulent claims. As to the Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA),[2] the conspirators submitted over

---

[2] CHAMPVA was a comprehensive federal health care program in which the United States Department of Veterans Affairs shared the cost of covered health care services and supplies

approximately $1.8 million in illegal DME claims to Medicare, resulting in payments of over approximately $330,000.

     **a.**     **Overview of Medicare's Coverage of Durable Medical Equipment**

        *1.*     *Medicare Part B*

16.    At all times relevant, Medicare was a federal health benefit program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.

17.    Pertinently, Medicare "Part B" covered outpatient care and supplies, including DME. However, Medicare Part B only covered DME when the equipment was medically necessary and ordered by licensed medical doctors or other qualified health care providers.

18.    Medicare "beneficiaries" were those individuals that received Medicare benefits. Beneficiaries could only receive Medicare-covered DME from suppliers that were enrolled in Medicare.

19.    The United States Department of Health and Human Services, through its agency, Centers for Medicare & Medicaid Services (CMS), oversaw and administered Medicare. To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs."

---

with eligible beneficiaries. In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover.

MACs performed many functions, such as processing Medicare claims and enrolling suppliers into the Medicare program.

20.     Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC and (ii) Noridian Healthcare Solutions (collectively referred to as the "DME MACs").

> 2.     *Supplier Enrollment in Medicare Part B*

21.     A different MAC, Palmetto GBA, LLC, also referred to as the National Supplier Clearinghouse ("NSC") MAC, handled the enrollment of DME suppliers into Medicare. The NSC MAC was the single entity responsible for issuing or revoking Medicare supplier billing privileges for DME suppliers.

22.     To enroll in Medicare Part B, DME suppliers were required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare.

23.     The Form CMS-855S listed many standards necessary to obtain and retain Medicare billing privileges as a DME supplier. Specifically, DME suppliers were required to provide complete and accurate information on the Form CMS-855S and report any changes to such information to the NSC MAC within 30 days. In addition, the standards for DME suppliers included the following requirements:

> a.     An authorized individual (one whose signature is binding) must sign the application for billing privileges;
>
> b.     DME suppliers were prohibited from direct solicitation to Medicare beneficiaries;

    c.  DME suppliers had to fill orders from their own inventory or, otherwise, were to contract with another company for the purchase of items to fill orders;

    d.  DME suppliers had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

    e.  DME suppliers had to disclose any person having an ownership, financial, or control interest in the supplier;

    f.  DME suppliers must not convey or reassign a supplier number (*i.e.*, the supplier may not sell or allow another entity to use its Medicare billing number); and

    g.  All DME suppliers must be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

24.   The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or managing control of a DME supplier. This included (i) anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organizations with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

10

25.     "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who, directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a "W-2 employee" of the DME supplier.

26.     The Form CMS-855S also required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)[.]
>
> ***
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

27.     To enroll in Medicare, DME suppliers were required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of

Certification/Accreditation. The Board of Certification/ Accreditation had a set of standards that DME suppliers had to meet for accreditation, which were tested at on-site inspections and random re-inspections.

28.     The NSC MAC also conducted surprise on-site inspections for Medicare enrollment, which helped verify the information disclosed in the Form CMS-855S and supporting documents. An authorized site inspector would interview staff seeking, among other information, a complete list of all owners and managers and whether they or any of their relatives owned other medical entities.

29.     The NSC MAC inspection also involved a review of any on-site DME inventory. DME suppliers that did not maintain their own inventory could be asked to produce a contract with a third-party vendor, such as a DME "drop-shipping" company.

30.     Further, the NSC MAC inspection inquired about marketing efforts including, pertinently, direct solicitation or the utilization of any third-party to solicit beneficiary referrals via telephone.

31.     All Medicare-enrolled DME suppliers were subject to random re-inspections. During a re-inspection, an inspector could make the same inquiries noted above, request supporting documentation, and seek follow up information from the DME supplier. Failure to comply could result in the suspension or revocation of Medicare billing privileges.

### 3.    *Billing Medicare for DME Claims*

32.    Physicians, clinics, and other health care providers, including DME suppliers (collectively, "Providers") that provided DME supplies to beneficiaries were able to apply for and to obtain unique identification numbers allowing them to bill Medicare. Such unique identification numbers included, pertinently, (i) a "National Provider Identifier" ("NPI") and (ii) a "Provider Transaction Access Number" ("PTAN"). The NSC MAC was responsible for issuing PTANs to a DME supplier after approving its Form CMS-855S (the Medicare enrollment application).

33.    Providers that received NPIs and/or PTANs could file claims with Medicare to obtain reimbursement for medically necessary services or supplies provided to beneficiaries.

34.    Under Medicare Part B, claims for DME supplies could be submitted for payment to the DME MACs through a system known as an "Electronic Data Interchange" ("EDI"), which allowed DME suppliers to transmit claims to Medicare electronically.

35.    To enroll in electronic claims submissions, Medicare required that DME suppliers complete a Common Electronic Data Interchange agreement with the DME MACs. The Common Electronic Data Interchange agreement required DME suppliers to agree to several terms and conditions, including, for example, that it would submit accurate, complete, and truthful claims. They also had to agree that, because claims were paid from federal funds, anyone who misrepresented or falsified

any record or other information relating to any submitted claims could be subject to a fine and/or imprisonment under Federal law.

36.     To submit DME claims to Medicare, the DME supplier needed to report: (a) the type of service provided using a "Healthcare Common Procedure Coding System" code; (b) the date of service or supply; (c) the referring physician's NPI; (d) the charge for such services; (e) patient's diagnosis; (f) the NPI and PTAN for the DME supplier seeking reimbursement; and (g) certification that the supplies were medically necessary.

37.     Before submitting a claim to the DME MAC, the DME supplier also need certain information on file, including: (a) written documentation of a verbal order or a preliminary written order from a treating physician; (b) a detailed written order from the treating physician; (c) information from the treating physician concerning the beneficiary's diagnosis; and (d) proof of delivery of the orthotic brace to the beneficiary.

### 4.     *Beneficiary Copayments and Deductibles*

38.     Assigned claims were those for which the Provider obtained payments directly from the MAC. In order for a claim to be classified as such, the Provider agreed to accept the MAC's determination as to the billed items allowable charge and accept 80 percent of that amount as Medicare's complete financial obligation. The remaining 20 percent was the responsibility of the beneficiary. This portion of

the cost of an item or service which the Medicare beneficiary must pay was called the beneficiary's copayment.

39.    The Medicare "deductible" was the amount that the beneficiary must pay before Medicare will pay for any items or services for that individual.

40.    Providers were not permitted to routinely waive copayments and deductibles.

### b.    The Conspirators

### 1.    *The Ever Prime Faction*

41.    Ever Prime Concepts, Inc. was a California company principally owned and controlled by conspirators Charles Burruss and Ardalaan "Armani" Adams, who operated and managed the company with other conspirators. These individuals are collectively referred to as the "Ever Prime Faction."

42.    Ever Prime purported to offer management services to companies selling DME. In reality, Ever Prime was a shell company used by the Ever Prime Faction to operate a fraudulent network of affiliated DME supply companies, or DME "fronts" located in the Middle District of Florida and elsewhere, including, but not limited to, the following entities (hereinafter referred to as the "DME Fronts"):

| DME Front | Medicare ID/NPI | Reported Address |
|---|---|---|
| Absolute Comfort Medical | 7703200001 | 11350 66th Street, North, Suite 107 Largo, FL 33773 |
| Advanced Medical Supply LLC | 7636320001 | 41530 Enterprise Circle South, Suite 201 Temecula, CA 92590 (formerly 1301 Seminole Boulevard, Suite 142, Largo, FL 33770) |

| | | |
|---|---|---|
| American Bracing Solutions Inc. | 7662740001 | 1301 Seminole Boulevard, Suite 141 Largo, FL 33770 |
| Back Braces Plus Inc. | 7653850001 | 9365 US Highway 19 North, Suite A Pinellas Park, FL 33782 |
| Belle Oak Bracing, Inc. | 7698410001 | 3900 Belle Oak Blvd., Suite 101 Largo, FL  33771 |
| Bracing Partners, Inc. | 7661490001 | 9950 W Van Buren St, Suite 115 Avondale, AZ, 85323 (formerly 1301 Seminole Boulevard, Suite 115, Largo, FL 33770) |
| Campbell Medical Supply, Inc. | 7714020001 | 11350 66th Street, North, Suite 101 Largo, FL  33773 |
| Caring For Your Pain Bracing, Inc. | 7663950001 | 8800 49th Street North, Suite 209 Pinellas Park, FL 33782 |
| CP Bracing Supply, Inc. | 7666130001 | 801 W Bay Drive, Suite 505 Largo, FL 33770 |
| Discovery Medical Supply, Inc. | 7609580001 | 1301 Seminole Boulevard, Suite 117 Largo, FL 33770 |
| First Stop Medical Supply, Inc. | 7666200001 | 8800 49th Street North, Suite 309 Pinellas Park, FL 33782 |
| Holiday Medical Solutions, Inc. | 7711320001 | 2435 US Highway 19, Suite 310 Holiday, FL 34691 |
| Jackson Medical Supply, Inc. | 7673230001 | 801 W Bay Drive, Suite 515 Largo, FL 33770 |
| Jaime Medical, Inc. | 7718400001 | 11350 66th St. N, Unit 101 Largo, FL 33773 |
| Layne Medical Supply, Inc. | 7691340001 | 39047 County Road 54, Zephyrhills, FL 33542 |
| LJH Medical Solutions, Inc. | 7666180001 | 801 W Bay Dr., Suite 504 Largo, FL 33770 |
| Lucky Medical Supply, Inc. | 7666990001 | 14004 Roosevelt Blvd, Suite 612 Clearwater, FL 37762 |
| Mainlands Medical, Inc. | 7707430001 | 9371 US Hwy 19 North, Suite D Pinellas Park, FL |
| SST Medical Solutions, Inc. | 7729020001 | 801 W Bay Dr., Suite 605 Largo, FL 33770 |

| Sunshine Medical Solutions | 7696110001 | 6148 Lee Hwy, Suite 203<br>Chattanooga, TN 37421 |
|---|---|---|
| Tower Medical Supply, Inc. | 7708660001 | 905 E Martin Luther King Jr Dr., Suite 216,<br>Tarpon Springs, FL 34689 |
| Tree Top Medical Inc. | 7699030001 | 9365 US Hwy 19 North, Suite A2<br>Pinellas Park, FL 33782 |
| Wellness Medical Solutions Inc. | 7695070001 | 99 NW 183rd Street., Suite 224C4<br>N. Miami Beach, FL 33169 |
| Westside Medical Bracing, Inc. | 7691160001 | 39029 County Road 54,<br>Zephyrhills, FL 33542 |

### 2.    The Regency Faction

43.    Regency, Inc. was a DME billing and consulting company in Largo, Florida owned and operated by Kelly Wolfe. Wolfe and others who helped manage and operate Regency are referred to as the "Regency Faction."

44.    Regency's consulting services included, among other things, the creation and sale of "turn-key" DME supply companies to clients, including assisting clients with accreditation and Medicare-enrollment processes. The Ever Prime Faction used these services to establish DME Fronts.

### c.    Creating a Network of Fraudulent DME Fronts

45.    Beginning in 2017, the Ever Prime Faction conspired with the Regency Faction to expand an existing, fraudulent DME network into the Middle District of Florida.

46.    Regency sold and/or transferred to Ever Prime numerous newly-established DME Fronts – including those companies listed in paragraph 42 – immediately after Regency secured Medicare billing privileges for each front.

17

Regency was able to reassign their billing privileges by transferring the DME Fronts through stock purchases. With stock purchases, the new owner of a DME Front can use the existing NPI after providing Medicare with the purchase agreement and information about the new owners. By orchestrating sales this way, Regency enabled Ever Prime to immediately begin billing Medicare for fraudulent DME claims.

47.    For instance, in or about September 2018, the Ever Prime Faction caused the execution of a sham "stock purchase agreement" to transfer control of the DME Front "Wellness Medical Solutions, Inc." from the Regency Faction to the Ever Prime Faction for approximately $80,000.

48.    Regency further assisted the DME Fronts with maintaining Medicare billing privileges, a valuable service for which the Ever Prime Faction paid.

49.    The DME Fronts were created to facilitate the conspirators' billing of false and fraudulent DME claims to Medicare, CHAMPVA, and other federal health benefit programs for DME that was not medically necessary.

50.    Numerous DME Fronts were acquired and created for the purpose of, among others, spreading illegal DME claims across many entities in order to evade Medicare scrutiny. The availability of multiple DME Fronts was also necessary to ensure uninterrupted continuation of the fraud.

51.    To dupe inspectors so as to secure Medicare-billing privileges for the DME Fronts, the Regency Faction and the Ever Prime Faction executed sham

inventory contracts between the DME Fronts and Magic Medical, a fake, non-operational DME drop-shipping company created by the Regency Faction.

52.     For instance, in or around January 2018, the Ever Prime Faction and the Regency Faction executed, or caused the execution of, a sham contract between the DME Front Jackson Medical Supply and Magic Medical.

53.     The conspirators submitted false and fraudulent forms and supporting documentation to secure eligibility, in defiance of the express warnings on the forms regarding criminal and civil penalties for lying to Medicare to gain or to maintain enrollment.

54.     The conspirators also created bogus patient records for fictitious patients for the DME Fronts, and presented, or caused the presentation of, sham inventory contracts, bogus patient records, and other false and misleading information during and in connection with inspections.

**d.     Concealing True Ownership of the DME Fronts**

55.     The conspirators further concealed from Medicare and others, that Adams and Burruss owned, controlled, held financial interest in, and managed the DME Fronts, including through Ever Prime.

56.     Adams and Burruss were strategically left off the Forms CMS-855S, which requires disclosure of owners and managing employees. Instead, the Ever Prime Faction falsely and fraudulently reported on these enrollment forms the names of "straw" or "nominee" owners. These straw or nominee owners had no

meaningful involvement in the operation of the DME fronts and were often the relatives or close friends of the Ever Prime Faction.

57.     The Regency Faction covertly sold or transferred the DME Fronts to Ever Prime's control using sham transactions involving these straw or nominee owners. The Ever Prime Faction would fund the straw owners' "purchase" of the DME Fronts by funneling money to straw owners at or around the inception of a new DME Front. The straw owners, in turn, used some or all of this money to fund bank accounts associated with the DME Front.

58.     These layered transactions created the appearance that the straw owners owned the DME Fronts; however, the Ever Prime Faction conspirators actually owned, controlled, and managed the DME Fronts.

59.     In addition to listing these straw owners on Medicare enrollment applications (*i.e.*, Forms CMS-855S), the Ever Prime Faction caused the listing of the straw owners on Florida corporate records, and other documents related to the DME Fronts.

60.     During and in relation to inspections, the Ever Prime Faction made, or caused to be made, false statements about the ownership and management of the DME Fronts. This subterfuge facilitated Medicare's approval of the DME Fronts.

**e.     Submission of Illegal DME Claims to Medicare Obtained Through Illegal Bribes and Kickbacks**

61.     To secure such high volumes of DME claims, Adams and Burruss used illegal bribes and kickbacks, in violation of the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).

### 1.     The Purchase of False DME Claims From Fraudulent Marketers

62.     Specifically, Adams and Burruss agreed to arrange, and did arrange, to purchase thousands of DME claims from so-called "marketers," including, among others, Global One Medical Solutions LLC, Unique Media Connections ("Unique"), which also does business as "Media Lead Kings," Cure Healthcare, Inc. ("Cure"), and SKF Enterprises LLC (collectively, referred to as "Marketers").

63.     The Marketers, for their part, had generated the DME claims under the guise of "telemedicine," when, in reality, they were simply bribing medical practitioners to sign brace orders. The conspirators, including Adams and Burruss, concealed these illegal kickback transactions by creating sham invoices that falsely described the sale of services, such as "marketing" or "search engine optimization."

64.     For instance, in or about February 2018, Adams received, and in turn, paid a fraudulent invoice in the amount of $125,000 from Global One. The falsified invoice from Global One stated that the $125,000 was for "marketing services," when, in truth, the charges were for the sale of illegal DME claims that had been induced by bribing medical practitioners.

65.     In addition, in or about May 2018, the Ever Prime Faction conspirators received a falsified invoice from Cure, in the amount of $30,000 for "search engine

optimization" and other services, when in truth, the charges were for the Ever Prime

Faction conspirators' purchase of illegal DME claims that had been induced by

bribing medical practitioners.

66.     Bank records and other documents revealed numerous financial

transactions through which Adams and Burruss illegally purchased, or caused the

illegal purchase of, DME claims from Cure and Unique (d/b/a Media Lead Kings),

as set forth, at least in part, in the table below:

| DME Front | Payments to Cure |
|---|---|
| American Bracing Solutions, Inc. | $25,000 |
| Back Braces Plus, Inc. | $25,000 |
| Caring For Your Pain Bracing | $25,000 |
| Discovery Medical Supply | $508,626 |
| Jackson Medical Supply | $25,000 |
| Layne Medical Supply | $397,840 |
| LJH Medical Solutions | $284,100 |
| Lucky Medical Supply, Inc. | $25,000 |
| Westside Medical Bracing, Inc. | $687,600 |
| **DME Front** | **Payments to Unique** |
| Advanced Medical Supply, LLC | $1,110,000 |
| American Bracing Solutions, Inc. | $725,000 |
| Back Braces Plus, Inc. | $125,000 |
| Bracing Partners, Inc. | $400,000 |
| Caring For Your Pain Bracing | $600,000 |
| CP Bracing Supply | $805,000 |
| Discovery Medical Supply | $1,254,835 |
| First Stop Medical Supply, Inc. | $375,000 |
| Westside Medical Bracing, Inc. | $50,000 |

67.     After the DME Fronts illegally obtained the doctor's orders, they, in

turn, submitted them or caused them to be submitted, to Medicare for

reimbursement.

68.     On or about the dates set forth below, each of which constituted a separate overt act, one or more Ever Prime Faction and/or Regency Faction conspirators signed, or caused the signing of, Forms CMS-855S (the Medicare enrollment application) for the DME Fronts, which, among other things, bound the DME supplier and its officials to abide by "all laws, regulations, and program instructions" for Medicare, including "the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)":

| On or About Date of Signature | DME Front |
|---|---|
| July 24, 2018 | Absolute Comfort Medical |
| October 6, 2017 | Advanced Medical Supply LLC |
| January 24, 2018 | American Bracing Solutions Inc. |
| January 2, 2018 | Back Braces Plus Inc. |
| June 23, 2018 | Belle Oak Bracing, Inc. |
| January 24, 2018 | Bracing Partners, Inc. |
| November 5, 2018 | Campbell Medical Supply, Inc. |
| January 24, 2018 | Caring For Your Pain Bracing, Inc. |
| February 6, 2018 | CP Bracing Supply, Inc. |
| June 7, 2017 | Discovery Medical Supply, Inc. |

69.     On or about the dates set forth below, each of which constituted a separate overt act, one or more Ever Prime Faction conspirators paid illegal bribes in the approximate amounts listed below to purported "marketing" companies as inducement, direct and indirect, to cause medical practitioners to sign and to prescribe DME brace orders:

| On or About Date | Source Account | Purported "Marketing" Company | Approx. Amount |
|---|---|---|---|
| March 16, 2018 | Advanced Medical, | SKF, | $11,040 |

| | WF -5136 | TD -2658 | |
|---|---|---|---|
| March 16, 2018 | Discovery Medical, JPMC -6270 | SKF, TD -2658 | $15,930 |
| September 21, 2018 | CP Bracing Supply, JPMC -1873 | Unique, WF -3200 | $50,000 |
| October 12, 2018 | Discovery Medical, JPMC -6270 | Cure, JPMC -1709 | $195,375 |
| October 19, 2018 | Layne Medical, JPMC -6270 | Cure, JPMC -1709 | $79,300 |
| December 21, 2018 | Back Braces Plus, JPMC -5912 | Unique, WF -3200 | $125,000 |

70.    On or about the dates set forth below, each of which constituted a separate overt act, one or more Ever Prime Faction conspirators submitted, or caused the submission of illegal DME claims, which were procured through illegal bribes, to Medicare and/OR CHAMPVA:

| On or About Date Service | Approx. Amount Paid | Claim Number | DME Front |
|---|---|---|---|
| December 17, 2018 | $869.63 | 18352712625000 | Absolute Comfort |
| September 28, 2018 | $607.93 | 18274713962000 | Advanced Medical |
| September 13, 2018 | $666.38 | 18257717053000 | American Bracing |
| May 29, 2018 | $929.37 | 18151742618000 | Back Braces Plus |
| December 17, 2018 | $607.93 | 18353712480000 | Belle Oak |
| November 8, 2018 | $869.63 | 18316714135000 | Bracing Partners |
| August 14, 2018 | $607.93 | 18227713092000 | Caring For Your Pain |
| July 20, 2018 | $797.85 | 18204712726000 | CP Bracing |
| March 5, 2018 | $869.63 | 18072714001000 | Discovery Medical |
| September 25, 2018 | $869.63 | 18269713885000 | Jackson Medical |

*2.    The Waiver of Deductibles and Copayments to Induce Beneficiaries*

71.    The Ever Prime Faction conspirators also routinely and unlawfully waived patient deductibles and copayments so as to induce Medicare beneficiaries to accept otherwise costly DME products reimbursed by the Medicare program.

72.    By forgiving their financial obligations, the beneficiaries were unlawfully induced in violation of the Federal Anti-Kickback Statute.

**f.    Use of DME Front Bank Accounts to Facilitate the Conspiracy**

73.    As part of their conspiracy, the Ever Prime Faction and the Regency Faction conspirators directed, or cause to be directed, Medicare and CHAMPVA payments for the illegal DME claims to be deposited in bank accounts created for the DME Fronts (hereinafter, the "DME Front Bank Accounts").

74.    The Ever Prime Faction used the names and identities of straw owners as authorized signors, and mimicked, or caused to be mimicked, signatures of the straw owners, including through electronic signatures, stamps, and other means, to conduct financial transactions using assets in the DME Front Bank Accounts.

75.    As de facto owners of the DME Fronts, Adams and Burruss had access to the DME Front Bank Accounts to conduct financial transactions.

76.    For instance, the Ever Prime Faction transferred, or caused the transfer of, assets from bank accounts under their control to accounts maintained and controlled by the Regency Faction conspirators so as to purchase DME Fronts as detailed below:

| On or About Date | Receiving Account | Approx. Amount | DME Front |
|---|---|---|---|
| January 11, 2018 | K.W., BB&T -3432 | $60,000 | Advanced Medical Supply |
| March 7, 2018 | Regency, WF -6768 | $30,000 | Back Braces Plus |
| April 10, 2018 | Regency, WF -6768 | $30,000 | American Bracing Solutions |
| May 2, 2018 | Regency, WF -6768 | $30,000 | CP Bracing Supply |
| May 4, 2018 | Regency, WF -6768 | $30,000 | Lucky Medical Supply |
| May 4, 2018 | Regency, WF -6768 | $30,000 | LJH Medical Solutions |
| June 12, 2018 | Regency, WF -6768 | $30,000 | Jackson Medical Supply |

77.     The Ever Prime Faction transferred, or caused the transfer of, millions of dollars from the DME Front Bank Accounts to other accounts held or controlled by Adams, Burruss, and others, to promote and to perpetuate the scheme and for other purposes. In causing these financial transactions to be made, the Ever Prime Faction knowingly conducted financial transactions they knew involved proceeds that came from unlawful activity—specifically 18 U.S.C. §§ 1035 (making false statements relating to health care matters), 1347 (health care fraud), 371 (conspiracy to commit offense against or defraud the United States) and 1349 (health care fraud conspiracy), as well as 42 U.S.C. § 1320a-7b(b)(2) (illegally offering and paying remuneration)—and caused these financial transactions to be conducted with the intent to promote the carrying on of that specified unlawful activity and to conceal

and disguise the nature, location, source, ownership, and the control of the proceeds, in violation of 18 U.S.C. §§ 1956 (a)(1)(A)(i) and (B)(i).

## II. DEFENDANT ASSETS CONSTITUTE PROCEEDS OF A HEALTH CARE FRAUD CONSPIRACY AND/OR ARE PROPERTY INVOLVED IN MONEY LAUNDERING

### a. The Defendant Assets Constitute Proceeds of a Health Care Fraud Conspiracy

78.    The information above demonstrates that the Defendant Assets identified in paragraph 1 constitute proceeds of the health care fraud conspiracy.

79.    The Ever Prime Faction and Regency Faction established the DME Fronts identified in paragraph 42 through fraud, including by, among other means, (i) submitting false and fraudulent enrollment applications and related documents to Medicare and its representatives, including during critical on-site inspections; (ii) creating bogus documents (*e.g.*, fake supplier contracts) to dupe inspectors; and (ii) fraudulently disclosing the names of straw or nominee owners to Medicare to conceal the conspirators' true ownership and managerial interests in the DME fronts. All of the DME Fronts were thus instrumentalities of the crime; their sole purpose was to submit false DME claims to Medicare. Accordingly, the very creation of the DME Fronts constituted a crime, and all proceeds from the DME Fronts represents proceeds of federal health care offenses.

80.    In addition, once established, the conspirators illegally used the fraudulent DME Fronts to submit numerous claims to Medicare for DME that were not medically necessary. Medicare paid these funds directly to the DME Front Bank

27

Accounts, including those accounts identified in paragraph 1(a) through 1(z) above. Thus, the Defendant Assets seized from the DME Front Bank Accounts, as identified in paragraphs 1(a) through 1(z) above, are criminal proceeds.

81.    In their respective plea agreements with the United States, Adams and Burruss, the true owners of the DME Fronts, have admitted that they own the Defendant Assets identified in paragraph 1(a) through 1(z), and that these assets constitute proceeds of their criminal conspiracy.[3]

82.    The Defendant Assets identified in paragraph 1(aa) were seized from an account owned and controlled by fraudulent marketer Unique. These funds were received from the fraudulent DME Fronts, and also constitute proceeds of the criminal conspiracy.

83.    The Defendant Assets identified in paragraph 1(bb) were seized from an account owned and controlled by fraudulent marketer Media Lead Kings. These

---

[3] In September 2020, conspirators Adams and Burruss each entered into a Consolidated Plea Agreement with the United States, consenting to the filing of a one-count Information in the Middle District of Florida charging conspiracy to violate the Anti-Kickback Statute, contrary to 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371. Adams and Burruss agreed to plead guilty, and admitted that a factual basis exists for the guilty plea. Adams and Burruss further expressly admitted the conduct described in Parts C and D of the one-count Information, which conduct forms the basis for this civil forfeiture action. *See* Information (Doc. 1) at 16-24, *United States of America v. Ardalaan Adams a/k/a "Armani Adams"*, Case No. 8:20-cr-00294-MSS-CPT (M.D. Fla. Sept. 25, 2020); Information (Doc. 1) at 16-24, *United States of America v. Charles Burruss*, Case No. 8:20-cr-00293-MSS-TGW (M.D. Fla. Sept. 25, 2020).

funds were received from the fraudulent DME Fronts, and also constitute proceeds of the criminal conspiracy.

84.   Adams and Burruss have admitted that, to the extent the Defendant Assets in paragraph 1(aa) and 1(bb) are traceable to payments from the DME Fronts, those funds are proceeds of their criminal conspiracy and were paid to co-conspirator Unique in furtherance of the conspiracy.

### b.   The Defendant Assets in Paragraph 1(aa) and 1(bb) Also Constitute Property Involved in Money Laundering

85.   In addition to constituting proceeds of a criminal conspiracy, the Defendant Assets in paragraph 1(aa) and 1(bb), which include funds seized from the bank accounts owned by marketer Unique (also d/b/a Media Lead Kings), are also property involved in money laundering, or are traceable to such property.

86.   While the Marketers intended to appear as legitimate marketing businesses, their true purpose was to sell doctors' orders to the DME Fronts and, in turn, receive illegal kickbacks from the DME Fronts. The transfer of funds to the Marketers were designed to conceal and disguise the source and nature of the fraud proceeds, so as to give them the appearance of legitimacy. Because the funds were involved in money laundering, they are subject to forfeiture.

## III.   CONCLUSION

87.   As required by Supplemental Rule G(2)(f), the facts set forth above support a reasonable belief that the Government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the Government will

be able to show by a preponderance of the evidence that the Defendant Assets are derived from proceeds of a criminal conspiracy to commit health care fraud offenses and defraud the United States and/or constitute property involved in money laundering.

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of America, requests that this Court initiate a process of forfeiture against the Defendant Assets, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order the Defendant Assets forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: September 28, 2021                Respectfully submitted,

                                         KARIN HOPPMANN
                                         Acting United States Attorney

                              By: _____
                                         JAMES A. MUENCH
                                         Assistant United States Attorney
                                         Florida Bar Number 472867
                                         400 North Tampa Street, Suite 3200
                                         Tampa, Florida 33602
                                         (813) 274-6000 – telephone
                                         E-mail: james.muench2@usdoj.gov

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Tina L. Repp, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 27 day of September, 2021.

TINA L. REPP
Special Agent
Federal Bureau of Investigation

31